In the Matter of the Petition of THEODORE A. MYERS, Administrator, etc., for an Allowance out of the Estate of ALFRED G. MYERS, Deceased.

In the Matter of the Petition of LOUISA MYERS for an Allowance out of the Estate of ALFRED G. MYERS, Deceased.

M., by his will, gave all his estate, substantially the whole of which was invested in the business of a firm of stock brokers, of which he was a member, to his executors, in trust, with direction to pay the income thereof in equal shares to his two sisters, and after their deaths to divide the principal equally between his two surviving partners, one of whom was one of his executors. The day after M. died said survivors formed a new partnership, taking in another member, and continuing the business under the same firm name, the new firm appropriating and using all the assets of the old firm and assuming its debts. The firm owed M., at his decease, $180,000, principally loans to customers, for which the firm held ample security, and this was held by the new firm in the same manner. In proceedings for an accounting by the executors

.it appeared that said sum had earned legal interest; the executors claimed it should be considered a call loan, and only interest charged at the rate for which such loans could be effected, *i. e.*, two per cent. They were charged with and directed to pay legal interest. *Held*, no: error; that independently of the relation one of the executors sustained. to the firm, the loan of the trust fund to it without security, or the employment of the fund in the firm business, with the permission or acquiescence of the executors, was unauthorized, and they were personally responsible therefor, and were properly charged with full legal interest without regard to the productiveness of the investment; also, that if any one of the executors had no actual knowledge of the use made of the property, as he could have known of such use by the exercise of ordinary vigilance, he was liable.

*It seems*, in such case executors may, at the election of the beneficiaries, be compelled to account and pay for the use of the funds either the highest legal rate of interest or the actual profits resulting from such use.

Also *held*, that the executor who was a member of the new firm, could not make an agreement with himself, as executor or as surviving member of the old firm, for the use by the new firm of the trust funds or the funds of the old firm as a call loan at two per cent.

Also *held*, that under the circumstances the executors were liable to pay interest upon the funds intermediate the death of M. and the probate of his will.

It appeared that the executor, who was a member of the new firm, deposited various sums with a trust company in the name of the old firm. These were dealt with by him as if they were his own funds. The certificates of deposit were formally assigned to M.'s executors after the commencement of these proceedings, but the assignment was so drawn that the individual executor could make use of them. The deposits did not exceed in amount the sum a firm engaged in a similar business. would ordinarily keep on deposit in some banking institution for the purpose of maintaining its credit. *Held*, that such deposits might properly be deemed to be that of the new firm and made for its benefit; not as a deposit of the trust fund.

Also *held*, that in arriving at the value of the trust fund the actual, not the inventoried, value was to be taken.

A proceeding was commenced under the Code (§ 2650) by a brother of the testator for a revocation of the will, which is still pending; the brother executed a written consent that, during its pendency, the whole income might be paid to his sisters. *Held*, that the liability of the executors. was not affected by such proceeding.

The surrogate ordered the executors to pay each of the petitioners out of the principal of the trust fund one-half the referee's and stenographer's fees incurred in the proceeding. This part of the order was struck out by the General Term. *Held*, error; that such fees and the costs of the

beneficiaries in the Supreme Court and in this court should be paid out of the principal of the trust estate.

(Argued February 10, 1892; decided March 1, 1892.)

CROSS-APPEALS from orders of the General Term of the. Supreme Court, in the first judicial department, made December 2 and 11, 1891, in the above-entitled proceedings, which modified and affirmed as modified orders of the surrogate of the county of New York granting allowances out of the estate of Alfred G. Myers, deceased.

The nature of the proceedings, and the facts so far as material, are stated in the opinion.

*Edgar M. Johnson* for executors. The executors are chargeable with only $1,450 and interest to each petitioner, instead of $4,983.72, being one-half of six per cent interest on $157,017.85, as decided by the General Term. (*People* v. *Campbell,* 82 N. Y. 247; *Shuttleworth* v. *Winter,* 55 id. 624; *King* v. *Talbot,* 40 id. 76; *Cook* v. *Lowry,* 95 id. 103; *Crawshay* v. *Collins,* 2 Russ. 323; *Wedderburn* v. *Wedderburn,* 22 Beav. 84; *Morgan* v. *Morgan,* 4 Dem. 354, 356; *Dill* v. *Wisner,* 88 N. Y. 153.) In any event the sum chargeable as principal to the executors cannot exceed $132,192.76, and the sum payable each petitioner, $4,196. (*Vultee* v. *Raynør,* 2 Hall, 376, 378; *Marre* v. *Ginochio,* 2 Bradf. 165, 167; *Gillespie* v. *Brooks,* 2 Redf. 349, 363; *Smith* v. *Collamer,* 2 Dem. 147, 150–153; *Applegate* v. *Cameron,* 2 Bradf. 119, 120; *Underhill* v. *Newburger,* 4 Redf. 499, 508; Redf. Surr. Pr. [4th ed.] 763.) Conceding that the charge of six per cent interest was correct in case of Mr. Rutherford, it cannot be sustained as against his co-executors. (Perry on Trusts, § 415; *Cocks* v. *Barlow,* 5 Redf. 406; *Douglass* v. *Satterlee,* 11 Johns. 16; *Croft* v. *Williams,* 88 N. Y. 384; *Nanz* v. *Oakley,* 120 id. 84, 89; *Cocks* v. *Haviland,* 124 id. 426, 431; *Wilmerding* v. *McKesson,* 103 id. 329; *Williams* v. *Nixon,* 2 Beav. 472; Lind. on Part. 593, 594.) Even admitting such a liability to

Statement of case.

exist subsequently, it was unquestionably erroneous to charge the executors with interest for the time prior to the date of their entering office. (2 R. S. 71, § 16.) Improper evidence was admitted by the referee. (*Allen* v. *Way*, 7 Barb. 585; *Sherman* v. *D., L. & W. R. R. Co.*, 106 N. Y. 542; *Sullivan* v. *Sullivan*, 52 How. Pr. 453.)

*George M. Thompson* for petitioners. Independent of the fact that the estate actually earned six per cent, the law would have construed it to have earned that rate from the use made of the moneys of the estate. (Perry on Trusts, § 464; *Marrin* v. *Marrin*, 1 Johns. Ch. 527; *Townshend* v. *Townshend*, 1 Giff. 201; *Kyle* v. *Barnett*, 17 Ala. 306; *Nelson* v. *H. Bank*, 27 Ind. 53; *King* v. *Talbot*, 40 N. Y. 86; *Duffy* v. *Duncan*, 35 id. 187; *Young* v. *Brush*, 38 Barb. 294; *Owen* v. *Peebles*, 42 Ala. 338; *Wistar's Appeal*, 54 Penn. St. 60; *Jacob* v. *Emmett*, 11 Paige, 142; *Kellett* v. *Rathbon*, 4 id. 182; *Spear* v. *Tinkham*, 2 Barb. Ch. 211; *Brown* v. *Pickett*, 4 Johns. Ch. 303; *Barry* v. *Saunders*, 16 How. Pr. 543; *Oswald's Appeal*, 3 Grant, 303; *Martin* v. *Payborn*, 42 Ala. 458; *DePeyster* v. *Clarkson*, 2 Wend. 77; *White* v. *Parker*, 8 Barb. 48; Walkers on Executors, 230; *Heathcote* v. *Hulme*, J. & W. 122; *Decker* v. *Somes*, 2 M. & K. 655; *Wedderburn* v. *Wedderburn*, 4 M. & A. 41; *MacDonald* v. *Richardson*, 1 Giff. 81; *Manning* v. *Manning*, 1 Johns. Ch. 527; *Prescott's Estate*, 1 Tuck. 430; *Hood's Estate*, Id. 396; *Adair* v. *Brimmer*, 74 N. Y. 540; *Spear* v. *Dinkham*, 2 Barb. Ch. 105; *In re Berwick*, 1 L. Bull. 8; L. R. [8 Ch.] 309; L. R. [7 H. L.] 318; *Brown* v. *Lansome*, 1 M. & Y. 426; *Ex parte Hilliard*, 1 Ves., Jr., 39; *Roch* v. *Harte*, 1 Ves. 60.) The answers in these proceedings were interposed in bad faith, for the purpose of holding back from the court the position of the estate's money and securities. (*Deobold* v. *Oppermann*, 111 N. Y. 537.) The referees and stenographer's fees and the costs and disbursements of these appeals should not be put upon the petitioners. (3 R. S. [5th ed.] 22, § 84; Id. 75, § 2.)

MAYNARD, J.   With the exception of some unimportant legacies, the testator gave his entire estate to the four executors of his will, in trust with the direction to collect, invest and reinvest the same, and pay the income thereof in equal shares to his two sisters, and after their death to divide the principal equally between his surviving partners in the business of stock brokers in New York city, one of whom was an executor and the other a brother of such executor.   Upon the day after his death this executor and his brother formed a new copartnership, taking in another member, and continuing the business under the same firm name, in which it had been carried on in the life-time of the testator.

It appears that substantially all the property which he left was invested in this business, and that he and the executor referred to contributed all its working capital, and that the firm owed him on various accounts over $60,000, and owed him and the executor jointly, upon an account known as the "I. R." account, the sum of $241,750, of which one-half, or $120,825, belonged to him, thus making the total amount due him from the firm over $180,000.   These accounts mainly represented loans on margins to customers, for which the firm held ample security, and it has been shown that they were all good, and that there has been no loss on any of them.   The new firm, upon its formation, immediately appropriated all the assets and business of the old firm, and the property of the testator was used by it in its business, evidently in the same manner in which it had been employed in his life-time by the firm of which he was a member.

The testator died March 8, 1887, and his will was proved and letters testamentary issued to the four executors, who all qualified on April fourteenth.   Since that time, the executors have paid to the sisters each the sum of $1,336 on account of the income of the trust funds in their hands, and have insisted that such amount, with the further sum of $4,055, constituted the entire income from such funds accruing from the death of the testator to October 24, 1888.   This amount scarcely

exceeds two per cent upon the estimated value of the property which came into their hands.

Within the time limited by law, a brother of the testator commenced proceedings, under the Code, for the revocation of the probate of the will, which are still pending. This brother and the two sisters are the only heirs at law of the decedent, and, in case his will should be declared invalid, would be entitled to all his property, including the income thereof which has accrued since his death, and the brother has executed a written consent that the whole of such income may be paid to his sisters, pending the contest over the will. In 1888, separate applications to the surrogate were made for an order requiring the executors to account and pay to the beneficiaries such additional income as they may have received from the trust property, or be lawfully chargeable with. The proceedings thereon were consolidated and a reference ordered.

The referee found, upon competent proofs, that the entire available estate of the testator was in the possession of the new firm; was actually employed by it in its business; that after rejecting all doubtful securities, it was of the net value of $180,000; that it had, during all the time since the formation of the firm, earned six per cent interest annually; and that, after deducting all payments and expenses, there was still due from the income of the trust fund to each petitioner the sum of $6,146. The surrogate confirmed the report and directed payment accordingly. The executors appealed to the General Term, where the order of the surrogate was modified by reducing this amount to $4,983, and from the decision of the Supreme Court both parties have appealed to this court.

The principal question to be determined involves the rate of interest upon the trust estate for which the executors should be held accountable. The executors claim that these moneys have been used in the stock brokerage business of the firm, of which one of their number is a member, and that it is to be regarded in the nature of a call loan to that firm, and as such loans can usually be effected in Wall street at two per cent,

and sometimes for less, they should not be required to account for any greater sum.

Independently of the relation which one of the executors sustained to the firm, it is apparent that this claim is untenable. Under the rules of law, as they have been judicially construed, which control trustees in the management of estates committed to their care, and which fix the measure of their responsibility, the loan of the trust property by the executors to a firm of stock brokers, without any security other than the personal obligation of the borrowers, or the employment of such property in a business of that character with the permission or acquiescence of the executors, was unauthorized, and the executors became personally responsible for the fund, and in such cases interest at the full legal rate is chargeable against them so long as the prohibited use of the fund continues, and without regard to the productiveness of the investment.

The rule upon this subject is well stated by Chief Judge RUGER in *Deobold* v. *Oppermann* (111 N. Y. 538), where, speaking of the proper uses to which trust funds may be put, he says: "Their employment by the trustees in trade, or as loans to persons engaged in such business, or in the prosecution of mercantile, commercial and manufacturing enterprises or speculative adventures, has been uniformly condemned as illegal and as constituting a *devastavit* of the estate."

In this view it is immaterial whether the trustees are themselves directly interested in the business undertaking in which trust moneys have been improperly invested. They become the debtors of the estate to the extent of the misappropriation, and the law prescribes the rate of interest upon every indebtness where it is not fixed by the agreement of the parties. The reason of the rule is, that as the primary object of the creation of a trust is ordinarily the preservation and perpetuity of the fund until the purposes of the trust have been accomplished, this object is necessarily endangered and may be entirely defeated by exposing the estate to the perils of commercial pursuits, which are always, to some extent, speculative and subject to the hazard of great loss.

In *King* v. *Talbot* (40 N. Y. 86), it was declared that the degree of diligence and prudence which trustees are required to exercise in the care and management of trust estates "necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust and the consequences of a mistake in the selection of the investment to be made."

The executors seek to avoid the application of this rule by the claim that this employment of the trust property was necessary in order to prevent a substantial shrinkage in its value, which would probably have resulted from its immediate withdrawal from the business in which it was invested at the time of testator's death. But this claim is not sustained by the proofs. The testator's firm was not insolvent when he died and it is not shown that there would have been any failure to have realized the full amount of its indebtedness to him, if its affairs had been wound up by the surviving partners in the usual way. It may be that a forced sale of the stocks and bonds, which were held as collateral security for the loans of the firm, would have resulted in a loss; but they could have been held for a reasonable period by the surviving partners, and the loans taken up and converted into money, if necessary, and without involving them in the general risks of the business conducted by their successors. There was, in fact, no delay in the settlement of the business of the old firm. All of its assets were immediately transferred to the new firm and all of its liabilities assumed by the latter. The transaction must be regarded as a sale, the consideration of which was the payment of the debts of the old firm. Even if the proper inference from the evidence is that credit was to be given upon the transfer for a sufficient length of time to enable the new firm to close the accounts of the old firm in the ordinary course of business in Wall street, there is no proof of any agreement that less than the full legal rate of interest was to be paid meanwhile. The executor, who was a member of both firms, testified that he regarded the indebtedness of the

new firm to the estate as a call loan, and that he allowed on this loan the prevailing rate of interest for call loans, which was two per cent. It is scarcely conceivable that circum-stances could exist in any case which would render lawful a call loan of trust funds to stock brokers. It is sufficient, how-ever, to say that the executor, who was a member of the new firm, could not make an agreement with himself as executor of the estate, or with himself as surviving member of the old firm, stipulating for the use by the new firm of the trust funds, or of the funds of the old firm, as a call loan at two per cent interest. Call loans are generally negotiated at a low rate, because of the undoubted character of the security required, and because they can be promptly called in at the first indica-tion of the danger of loss. A trustee undertaking to make a call loan to a firm of which he is a member, would be likely to look with indulgence upon any security which it might offer and be slow to discover any sign of peril to the investment, or to act upon the discovery when made.

We have thus far considered the liability of the executors for interest upon the broad ground of the want of authority on their part to permit the trust estate to be used by the new firm in the business in which they were engaged. The same result would be reached in view of the undisputed fact that these funds were actually loaned by the new firm to their customers at six per cent interest, which was in all cases real-ized without loss. One of the executors was a member of the firm and was permitted by his co-executors to have the active management of the estate. The same rule will apply as if he had employed the funds in his own individual business, in which case it cannot be doubted that he must account for their use at the highest rate imposed by law, or for the actual profits resulting from the investment of the trust property in such business, if the beneficiaries elect to compel him to do so. (Perry on Trusts [3d ed.], § 464.)

The necessity for a strict application of these rules regulating the accountability and responsibility of trustees for the income of the trust estate is the more urgent in the present case,

because of the interest which the active executor and his brother have in the property after the termination of the trust. Under the will the corpus of the estate then goes to them in its entirety. Whatever income may be withheld increases the amount which they will ultimately receive, and thus the loss of the beneficiaries in this respect would be their gain. The liability of the trustees is not affected by the pendency of the application for the revocation of the probate of the will. Section 2650 of the Code does not stay the proceedings of the executors for the recovery and preservation of the estate, or for the collection and payment of debts; nor sanction any investment or appropriation of the property in their custody, not otherwise lawful or proper.

Nor are the executors relieved from liability for the interest which accrued intermediate the death of the testator and the probate of the will. So far as it concerned the trust property the letters testamentary, when issued, related back to the time of the testator's demise, and invested the executors with the title thereto as of that date, and, as the property had been immediately taken possession of by the firm of which one of the executors was a member, and actually employed in a lucrative business earning at least six per cent interest, it was the duty of the executors, when they qualified, to collect such interest from the firm and pay it over to the petitioners in these proceedings.

It is not necessary to consider the effect of the deposit with the trust company of various sums, made in the name of the old firm. They were dealt with by the executor, who was a member of both firms, as if they were his own funds. The certificates were not assigned, even in form to the executors until the commencement of these proceedings. The assignment was so drawn that the individual executor could make use of them, and the amounts deposited do not seem to be in excess of the sums which a firm engaged in such business would ordinarily keep on deposit in some banking institution for the purpose of maintaining their credit. Under such circumstances, the deposit may properly be deemed to be that of

the firm and to have been made for its benefit. (Perry on Trusts [3d ed.], § 464.)

Interest upon the trust fund was, therefore, properly charged at the rate of six per cent, and the appeal of the petitioners presents the further question as to the amount of the principal of the estate upon which it should be computed. The surrogate directed that the computation should be made upon $180,000. The Supreme Court reduced this sum to $157,017.

We cannot avoid the conclusion that the decision of the surrogate, in this respect, was right. While there is some confusion in the figures, yet the evidence of one of the executors seems to leave but little doubt that property of the value of over $180,000 belonging to the trust estate came into the possession of the new firm immediately after the testator's death, upon which they derived an income down to the hearing before the referee. The actual and not the inventoried value is to be taken. The executor testifies that upon the various accounts which the testator had with his firm, there had been received $186,317, and after deducting certain debits to the amount of $5,396, he declares that "the net personal estate is $180,921."

These sums do not include the so-called unavailable securities upon which nothing has yet been realized. At another place the executor says there will be no loss on any of these accounts. The General Term finally put its decision upon the ground that the only securities which seem to have been available in the different accounts belonging to the testator, were those in what was known as the I. R. account and the bond account, which aggregated $157,000. But the suspense account represented an indebtedness of over $23,000 besides the securities to its credit, which were taken possession of by the new firm, and, under the rule we have adopted, interest at six per cent is chargeable upon this indebtedness.

There was also the profit and loss account, upon which over $4,000 was realized. It is, therefore, apparent that the amount of the principal of the trust estate upon which interest is

chargeable was correctly computed by the referee and the surrogate, and that no deduction should be made therefrom.

The executors were all properly charged with liability to account for and pay over the income of the trust estate, under the proofs in this case. They all qualified; they all united in causing the inventory to be made; they must all have known of the condition of the estate as disclosed by the inventory; two of them, certainly, had actual knowledge of the use which was made of the property; if the others did not know, they could have known by the exercise of ordinary care and vigilance that the funds had been diverted from the usual course of trust investments and were employed in the business of the new firm.

Upon the most favorable view of the facts they are brought within the operation of the rule laid down by this court in *Wilmerding* v. *McKesson* (103 N. Y. 329).

The surrogate directed the exectors to pay each petitioner out of the principal of the trust estate the sum of $183, being one-half of the referee's and stenographer's fees incurred in the proceedings. The General Term modified the order by striking out this provision, which we think was error.

One-half of the trust estate, upon the termination of the trust, goes to the executor through whose active participation in the unauthorized use of it the institution of these proceedings was rendered necessary. It also appears that one of the beneficiaries who was entitled to one-half of the income of the estate has died since these proceedings were begun, and that such part of the income must accumulate for the joint benefit of this executor and his brother during the life-time of the surviving beneficiary, and there is, therefore, sufficient funds out of which these expenses can be paid without impairing the income to which the surviving beneficiary is entitled.

That part of the orders appealed from, reducing the amount of income to be paid to each petitioner from $6,176.31 to $4,983.72, and striking out the provision in the order of the surrogate directing the payment of referee's and stenographer's fees, should be reversed and the orders of the surrogate modi-

fied by directing that such fees be paid out of the income of that part of the trust estate to which Matilda Myers was entitled in her life-time, accruing since her death, and as so modified the orders of the surrogate should be affirmed, with costs to the petitioners in this court and the Supreme Court, to be paid out of such income accruing since the death of Matilda Myers.

All concur.

Judgment accordingly.

Upon a motion subsequently made to amend the remittitur, the following *mem.* was handed down:

"This is a motion to amend the remittitur so as to direct that the costs be paid out of the principal of the trust estate and not from a portion of the income, and we think it should be granted.

"The court received the impression, upon the argument, that it was conceded that the income of one-half of the trust fund, to which Matilda Myers was entitled in her life-time, must accumulate until the death of her sister, and that the costs might properly be paid out of such income in accordance with the suggestion in the last opinion of Justice DANIELS at General Term. It seems that this was a misapprehension of the position of counsel and that the question of the disposition of this income should not be embarrassed by any intimation or suggestion from the court upon the determination of this appeal. The remittitur should be amended by striking out the modification of the surrogate's decree in this respect, and directing an affirmance of the decree, with costs of both parties in this court and the Supreme Court, to be paid out of the principal of the estate in the hands of the executors."

All concur.

Ordered accordingly.