GERTRUDE P. BROWN and Others, Plaintiffs, *v.* JOHN J. PHELAN and Others, Defendants.

Supreme Court, New York County, June 26, 1927.

**Trusts — trustees — action for removal and to charge cotrustees with defalcation of other trustee — evidence shows defendants should be removed and should be charged with certain defalcations by other trustee.**

This is a proceeding by the beneficiaries of a testamentary trust for an accounting and for the removal of the trustees and to charge them with defalcations made by a cotrustee. While it appears that the defaulting trustee took active charge of the affairs of the trust, still the defendants were not passive trustees to such an extent as to relieve them of responsibility, for it appears that in 1910 they signed an inventory and appraisal of the estate for purposes of transfer tax proceedings, that a number of checks were signed by all the trustees, that in 1913 an account was presented, signed by all of the trustees, in which they charged themselves with possession of certain assets, and that in other ways they assumed an active responsibility for the management of the estate, though no substantial part of the assets was actually in the custody or control of the defendants. Under all the circumstances, the defendants are chargeable with the acts of waste or misappropriation of their cotrustee.

The plaintiffs are entitled to a decree removing the trustees and for an accounting.

ACTION by beneficiaries and legatees against testamentary trustees for an accounting and for their removal and to charge said trustees with losses to the estate caused by larceny by cotrustee.

*Beekman, Bogue, Clark & Griscom* [*Edward K. Hanlon* of counsel], for the plaintiffs.

*Henry M. Stevenson,* for the defendants John M. Phelan, James T. Phelan and James J. Phelan Company.

*Smith, Reiher & Griffin* [*Frank V. Smith* and *Dominic Griffin* of counsel], for the defendant Eliot P. Phelan.

*Francis X. Dineen,* guardian *ad litem* for infant defendants.

VALENTE, J. The plaintiffs in this action, beneficiaries and legatees under the last will and testament of James J. Phelan, have brought this action against the trustees for an accounting and for their removal. The testator died on August 3, 1908, leaving an estate estimated in excess of $1,000,000 and designating executors and trustees as follows: " Having the greatest confidence in the honor of my sons and cousin, I hereby nominate, constitute and appoint my sons John J. Phelan, James T. Phelan, and my friend, John M. Phelan, executors and trustees of this my last will and testament. * * * No bonds shall be required of my said executors and trustees." This confidence of the testator was shamefully and wickedly abused by John J. Phelan, who looted the estate of a sum in excess of $500,000 and in 1925 disappeared. His peculations extended over a large period, but they were not discovered until after his disappearance. It is now sought by the beneficiaries to charge the two other trustees with the losses to the estate, despite the fact that unquestionably they, had no knowledge of the larceny and did not take a very active part in the management of affairs, which was practically in the hands of John J. Phelan. James T. Phelan resided outside of New York city, while John M. Phelan was an elderly man, who left the affairs to John J. The testator left him surviving a widow and eight children. Certain litigation ensued as to the construction of the will, initiated principally by the widow. It was compromised and a judgment entered accordingly, which largely modified the will. Reading the will and the judgment together we find the following provisions: The trustees were to pay the widow $10,000 a year and to set aside securities of the value of at least $200,000 in order to provide for this income. Upon her death the principal was to be divided. A similar trust was to be set up for the benefit of one Elizabeth Foren, to yield an annual income of $450. The bulk of the estate was to be divided into eight parts, one for each of the four sons and one for the benefit of each of the four daughters, with this distinction — the share payable to the sons was to be paid over outright, or at majority in the case of the two infant sons. The share for the benefit of the daughters was to be only for life, remainder to their issue *per stirpes*. Upon the disappearance of John J. Phelan, his cotrustees, with the energetic assistance of Mr. Stevenson, their attorney, made an exhaustive investigation from the chaotic records on hand and disclosed the following facts. Securities to the amount of over $200,000 were kept in a safe deposit vault in the name of the absconding trustee. To this the widow or her agent or attorney had the right of access upon request for purposes of inspection. Mrs. Phelan availed herself of this right,

but the last examination by her representatives took place in 1916; after that date no further inspection took place. The income of $10,000 was paid to the widow until her death in 1924. The principal then became payable to the remaindermen and the imminence of discovery of the missing securities probably precipitated John J.'s flight. These securities missing from the estate are stipulated to have been valued at $240,000 in 1913. In addition to paying the widow $10,000 per annum John J. paid to Elizabeth Foren (defendant Mrs. Day) the sum of $450 per annum, payable to her for life, until the latter part of 1924, after which payments ceased. To the three adult sons payments aggregating $250,000 were made, presumably on account of principal. The other five beneficiaries, the four daughters and one infant son, received each an average sum of $50,000, but the latter payments were substantially all on account of income. The sum of $209,000 was also invested in guaranteed first mortgage certificates of the New York Title and Mortgage Company. This sum was for the benefit of the five trusts, for the four daughters and the infant son, and the sums received by these five beneficiaries was largely the income from these certificates. In 1920 and 1921 John J. Phelan embezzled the proceeds of these mortgages. After his disappearance an action was begun against the mortgage company for the value of the securities, based on the ground that payment had been made to John J. instead of to the three trustees. A judgment was recovered, which was unanimously affirmed by the Appellate Division. (*Phelan* v. *N. Y. Title & Mortgage Co.*, 219 App. Div. 712.) It has been paid since the trial of this action and the proceeds, amounting to $270,000, less attorneys' fees and expenses, constitute the sole assets of the estate. Mention was made before of the large amount of real estate held by the James J. Phelan Company, the stock of which vested in the trustees. The real property was sold by John J. Phelan and the proceeds largely diverted by him to his own use. One other asset of the estate requires special mention — a note for $14,000, left by the testator. This bore interest at ten per cent, payable quarterly, each installment to bear interest until paid. The note was secured by collateral upon the remainder interest of the borrower, valued at $80,000, which became due after the death of Mrs. Van Rensselaer, an elderly lady. In December, 1924, John J. Phelan, with the knowledge and consent of his cotrustees, sold this note to the Westchester Mortgage Company for $8,500, which later foreclosed its lien. The plaintiffs in this action sought to set aside the assignment on the ground of fraud, but were defeated. The validity of the note itself has been sustained. The plaintiffs now

urge that the sale of the note was a gross waste of the assets of the estate, which could have been avoided if the note had been held. In addition they point out that only $5,000 of the sum received was distributed, the rest being misappropriated by John J. Phelan through the negligence of his cotrustees in authorizing him to receive the money. The defendant trustees seek to escape liability for the misappropriations of John J. Phelan by the claim that they were only passive trustees and the property never came into their hands. On the other hand, the plaintiffs show that the following facts are sufficient to indicate that they were sufficiently active to be charged with liability: In 1910 they all signed an inventory and appraisal for purposes of transfer tax proceedings. The signatures were on file with the Trust Company of America and the signature of one of them with the Lawyers Title Company. A number of checks were in fact signed by all of them. In 1913 an account was presented, signed by all three trustees. While it was not settled and no decree was entered thereon, nevertheless the trustees charged themselves with the possession of certain assets. It is true, as pointed out by the defendants, that the accounting was grossly erroneous in many particulars, but it cannot be brushed aside; while there were errors in detail, there was nevertheless an assumption of responsibility by the three trustees for the assets, consisting of securities and stock of the real estate company, which held valuable parcels of real property, and in 1924 upon a sale of the Van Rensselaer note all the trustees made affidavits in which they asserted that they have continued to act as executors and trustees since 1908 and are still acting as such. While it is true that no substantial part of the assets was actually in the custody or control of the two trustee defendants, it nevertheless becomes important to see whether the accounting presented, even though erroneous, and the admission of the trustees as to their activity, are not sufficient elements to estop them from now asserting that they were mere passive trustees and to charge them with liability for gross neglect in the performance of the trust duties which they assumed. An examination of the authorities on the subject shows that the law is settled to the extent that a trustee who has not had possession of the assets of the estate and suffers the cotrustees to obtain them and is not otherwise negligent in allowing the cotrustees to assume exclusive possession and management of the affairs, is not liable for waste or misappropriation. On the other hand, the acceptance of a trust imposes certain positive responsibility which the trustee cannot evade. If he is not inclined to meet them, he should not accept; but having

38

assumed the duty, he should be held to strict liability for the performance. As is said in *Earle* v. *Earle* (93 N. Y. 104, 113): " A trustee should act in relation to a trust property with reasonable diligence, and in case of a joint trust he must exercise due caution and vigilance in respect to the approval of, and acquiescence in, the acts of his cotrustees, for if he should deliver over the whole management to others, and betray supine indifference or gross negligence in regard to the interests of the *cestui que trust,* he will be held responsible. (Story's Eq. Juris. § 1275; *Clark* v. *Clark,* 8 Paige, 153, 160.) " And in *Matter of Myers* (131 N. Y. 409) the court, referring to the responsibility of executors who had permitted one of them to have active management of the estate, stated (at p. 420): " The executors were all properly charged with liability to account for and pay over the income of the trust estate, under the proofs in this case. They all qualified; they all united in causing the inventory to be made; they must all have known of the condition of the estate as disclosed by the inventory; two of them, certainly, had actual knowledge of the use which was made of the property; if the others did not know, they could have known by the exercise of ordinary care and vigilance that the funds had been diverted from the usual course of trust investments and were employed in the business of the new firm." The attorneys for the defendants urge in strenuous opposition the rule relating to passive trustees by which they are not held liable for the acts of waste of their associates if the funds wasted never came into their hands or under their control. (*Bruen* v. *Gillet,* 115 N. Y. 10; *Croft* v. *Williams,* 88 id. 384; *Adair* v. *Brimmer,* 74 id. 539.) But in the instant case the elements of negligence on the part of the cotrustees are so glaring as to make the rule inapplicable. For fifteen years they allowed John J. Phelan to manage the estate, supinely acquiescing in all his acts and making no effort to see that the provisions of the trust were properly carried out. It is true that the beneficiaries themselves were lax in enforcing a proper accounting. But the primary duty rested with the trustees, and their failure to protect their rights should not be permitted to shift the burden from the shoulders of those definitely intrusted with a responsibility. Certainly ordinary care and vigilance on the part of the cotrustees would have gone far to prevent the catastrophe. The rule limiting the liability of passive trustees must be strictly confined. Where, as in the case at bar, the cotrustees were more than passive, the rule expressed by Dean Bogert in an article entitled " The Liability of an Inactive Cotrustee " (34 Harv. L. Rev. 483, 502) contains much to commend it. Speaking of the responsibility of the passive trustee for the acts of his associate, he says:

" In the first place, to allow the cotrustee exclusive control of investments, the keeping of accounts, and expenditures from trust funds, is a delegation of discretionary duties. If the inactive trustee supervises the acts of his cotrustee, he becomes active and he may be said to make the acts of the cotrustee his own acts, to use his own discretion in the administration of the trust. But where there is no inspection, and the inactive trustee knows that discretionary duties must be performed, he is assuredly authorizing the active cotrustee to exercise such discretion and ought to be regarded as committing a breach of trust. *Secondly,* judged by the measure of care of the ordinarily prudent man, the inactive trustee is guilty of a fault in failing to supervise. No man of common business ability would entrust a stock of goods, for example, to an agent for months or years without an accounting or inspection, even if there were no breath of suspicion against the agent." At page 507 the same author well points out that the negligence of the so-called passive trustee is in a sense the proximate cause of the waste: " Furthermore, some courts have revolted at making the inactive trustee responsible because it would be mulcting one man for the wrong of another. Such reasoning is fallacious, it is submitted, because the negligence or passivity of the inactive trustee is as much a cause of the loss as the fraud or negligence of the active trustee. If the inactive trustee had not surrendered the trust property and management to his fellow-trustee, the latter would never have had the opportunity of wasting or stealing the funds. As well say that a trustee who leaves trust money in a public place where it is stolen should not be liable because the crime of the thief was the cause of the loss, as to hold the inactive trustee innocent when his negligence has opened the door for a breach of trust by his cotrustee." Much of the leniency toward passive trustees seems to have been caused by applying to them the rules applicable to inactive executors and administrators. Passivity of an executor is not necessarily a breach of duty, because each one of co-executors has separate powers and any one of them may act alone. But the discretionary duties of trustees must be exercised jointly. The conclusion must be that on principle James T. and John M. Phelan must be held responsible in general for the acts of waste or misappropriation of their associate. But as the degree of responsibility may be different as to some of the property wasted it is necessary to examine their responsibility more in detail; first, as to real estate. This was held by a real estate company controlled by the deceased. John J. Phelan continued in sole charge of the company and his associates never made the slightest effort to take any part in the administra-

tion of the affairs or to secure a transfer of the stock in the names of the trustees. Consequently, John J. Phelan was in a position to deal with the property as he pleased. The result was that much of the proceeds of the sale was embezzled. Some of the money may have been paid out to beneficiaries. The extent of this only an accounting can reveal. The responsibility of the cotrustees for the disappearance of securities in the Mary Phelan trust is not entirely free from difficulty. It is urged by the defendant trustees that these securities were in the sole custody of the absconding trustee and that the beneficiaries had full right of inspection, and in fact did exercise such right until 1916. Under these circumstances it is argued that the cotrustees could, in view of the check exercised by the beneficiaries, rely upon the fact that these securities were intact. It is true that if the beneficiaries had continued to exercise their privilege subsequent to 1916 the loss would probably not have occurred. On the other hand, the responsibility of the trustees in charging themselves in the inventory and the 1913 accounting with the value of these securities cannot be discharged by the mere failure of the beneficiaries to exercise a like duty. Therefore, they must be held for the loss of these securities as well. With regard to the sale of the Van Rensselaer note, the two cotrustees are undoubtedly liable for the amount of proceeds of the sale which they permitted John M. Phelan to convert. They cannot, however, be held liable for failure to secure an adequate price for it. The very fact that prolonged litigation was necessary to sustain the validity of the note, as free from the taint of usury, indicates that it was not an asset, the value of which was free from doubt. That the purchaser may subsequently succeed in realizing the sum of about $28,000 after prolonged litigation does not indicate that the trustees were so grossly negligent in the matter as to charge them with a deficiency by reason of the sale at a price which circumstances developed was inadequate. In justice to John M. and James T. Phelan, it must be said that the decision dictated by the commands of stern justice reflects no moral stigma upon their character. The words of Surrogate Thomas in a similar situation are peculiarly appropriate: " I do not find any fact which reflects unfavorably upon the moral purpose of Mr. Tuttle. Mr. Forrester was supposed by every one to be worthy of trust, and Mr. Tuttle never had cause to suspect him of dishonesty, and never did so suspect him until after the catastrophe, which left nothing to conjecture. * * * He was, however, negligent, and he failed to perform the duties of an executor. Just a little prudence on his part would probably

have sufficed to prevent the utter wreck of this estate, and, possibly, to have saved Mr. Forrester from a temptation which proved too strong for him." (*Matter of Dougherty*, 43 Misc. 468, 472.)   With regard to John M. Phelan, his position especially commends itself to the sympathy of the court.   He is a man who has grown old in long and honored service to the city, and who has been brought into the present position by confidence in one who proved himself utterly worthless of it.   But the court is helpless to temper justice with mercy in his case, and must leave the disposition of the matter to those aggrieved.   A decree must, therefore, be rendered as prayed in the complaint for the removal of the trustees and for an accounting as indicated in this opinion and for the appointment of a new trustee.   The payment of the judgment against the New York Title and Mortgage Company rendered it necessary to appoint a substituted trustee to receive the proceeds of the judgment, and such trustee has already been designated.   The accounting will have to proceed before a referee.   Practically the sole assets of the estate are moneys obtained upon the satisfaction of the judgment against the New York Title and Mortgage Company.   These proceeds are chargeable with the legal fees under the agreement entered into by the trustees with Mr. Stevenson.   It should be noted that the moneys realized represent principal of $209,000 and income in excess of that.   The legal expenses of the suit should, therefore, be divided and distributed as between principal and income in proportion.   While substantially all the money belongs to the five trust heirs, namely, the four daughters and Elliott Phelan, nevertheless to the extent to which they received any fictitious interest payment from John J. Phelan subsequent to the embezzlement of the proceeds of the mortgages, the residue of the estate will be entitled to a proper adjustment by reason of such payments.   Submit findings and judgment on notice.