PRESIDENT AND DIRECTORS OF MAN-
HATTAN CO. v. KELBY et al.
(three cases).

In re PRUDENCE BONDS CORPORA-
TION (two cases).

PRUDENCE REALIZATION CORPORA-
TION v. PRESIDENT AND DIRECTORS
OF MANHATTAN CO. (two cases).

Nos. 91, 92.

Circuit Court of Appeals, Second Circuit.

Dec. 18, 1944.

Supplemental Opinion Feb. 2, 1945.

Writ of Certiorari Denied April 2, 1945.

See 65 S.Ct. 916.

466

Maclay, Lyeth & Williams, of New York City (J. M. Richardson Lyeth, Mark W. Maclay, and Robert L. Fay, all of New York City, of counsel), for President and Directors of the Manhattan Co.

George C. Wildermuth, of Brooklyn, N. Y., for Clifford S. Kelsey.

Charles M. McCarty, of New York City, for Prudence-Bonds Corporation (New Corporation).

Joseph Nemerov, of New York City, for Leopold Helfant, Sarah Helfant, Samuel Plasser and Hilda S. Reese.

Samuel Silbiger, of Brooklyn, for George B. Eddy.

Irving L. Schanzer, of New York City, for Prudence Realization Corporation.

Before SWAN, CLARK, and FRANK, Circuit Judges.

**FRANK, Circuit Judge.**

1. These appeals constitute another chapter in the prolonged litigation we described in Brooklyn Trust Company v. Kelby, 2 Cir., 134 F.2d 105. Many of the pertinent facts need not here be narrated as they are stated in the reports of the Special Master which, together with the opinion of the District Court approving those reports, will be found in 57 F.Supp. 839.

The decrees below, based on the Master's reports, held that the President and Directors of the Manhattan Company (which we shall call the Bank) must account in a substantial amount for violation of its obligations as trustee under two trust agreements, virtually identical in their provisions, securing respectively the so-called Fifth Series and Ninth Series of bonds issued by Prudence-Bonds Corporation (which we shall call the Corporation). These violations consisted of improperly permitting the Corporation to withdraw cash and securities from the trust funds in violation of the release clauses of the trust agreements. Except as hereafter noted, we agree with the Master and the trial court in their con-

clusions that such violations occurred and that the Bank must therefore account. Our reasons follow:

2. Article I, § 1 of each trust agreement provides that the Corporation's bonds issued thereunder and outstanding should be secured by a trust fund, held by the Bank, as trustee, consisting of any or all of the following five types of security: (a) Bonds secured by first mortgages on income-producing real estate, (b) bonds and notes forming all or part of a series of similar obligations secured by first mortgages or deeds of trust made to corporate trustees, (c) bonds of the Corporation of other series, (d) securities of a kind legal for investment for New York savings banks under New York statutes, (e) cash, certificates of deposit issued by banks or trust companies, United States bonds or United States Treasury certificates, and bonds of the City or State of New York.

Article 1, § 6 (which we shall call the "release" clause) reads as follows: "Substitution and Withdrawal of Securities; Etc.—Unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation may from time to time withdraw any bonds, mortgages or other securities or cash from the Trust Fund (1) by substituting therefor bonds, mortgages or other securities or cash authorized by Section 1 of this Article equal in amount or value as prescribed by Section 4 of this Article to the unpaid principal of the bonds, mortgages or other securities or cash withdrawn; (2) by written application of the Corporation to the Trustee for such withdrawal at any time the principal amount of the Trust Fund may exceed the par value of the Prudence-Bonds then issued and outstanding hereunder. The Trustee will accordingly deliver the bonds, mortgages or other securities or cash so withdrawn, with any necessary assignments thereof, provided there shall remain in the Trust Fund after any such withdrawal, bonds, mortgages or other securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, sufficient in principal amount maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity date of any Prudence-Bonds then

issued and outstanding hereunder, when added to the value of securities and cash deposited under paragraphs (d) and (e), Section 1 of this Article (which are available for any period), to at least equal the principal amount of Prudence-Bonds then issued and outstanding hereunder maturing within such period, and further provided that if and as long as any securities deposited in the Trust Fund under paragraphs (a), (b) or (c), Section 1 of this Article, shall be in default in the payment of principal, the Corporation shall be permitted to withdraw only such securities deposited under said paragraphs (a), (b) or (c) as shall be in default (except in connection with the redemption or final payment at maturity of any other securities not in default deposited under such paragraphs). Upon the delivery to the Trustee for cancellation of any or all of the Prudence-Bonds secured hereunder with all unmatured coupons attached thereto, or cash equal to such coupons as are not delivered (or in lieu of any thereof, a certificate by an officer of the Corporation, approved by an officer of The Prudence Company, Inc., that certain of such bonds, with the coupons, if any, belonging thereto, matured at a date in excess of six years prior to the date of said certificate and have not been presented for payment), and unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation shall be entitled to withdraw from the Trust Fund and receive from the Trustee, in accordance with the provisions of the preceding paragraph of this section, bonds, mortgages or other securities of cash equal in amount and value to the principal amount of the Prudence-Bonds so actually presented for cancellation or represented by such certificate."

■ Reading that clause in the light of the nature and purposes of the entire instrument, we think that it imposed on the bank as trustee the duty not to permit withdrawals of, or substitutions for, any part of the trust fund unless all the following conditions were satisfied:[1]

(A) There must exist "no event of default under which the trustee may take action" (as such an "event" is defined in Article IV which deals with that subject).

(B) After any withdrawal or substitu-

---

[1] As to whether the facts exist which satisfy these conditions, the trustee, under Article V, § 1 of the agreement, is authorized to rely on a written representation of the Corporation signed and attested by certain designated corporate officers.

470

tion, the fund must be left in this state: There must be in the fund an amount of (a), (b) and (c) securities, taken at their principal amount, but not then in default as to principal in whole or part, which, when added to the cash and (d) and (e) securities, taken at their then market value, equals at least the principal of all the Corporation's bonds then outstanding. Among the securities just described, there must be an amount of (a), (b) and (c) securities, taken at their principal amount and similarly not in default, in whole or part, maturing during the six-months' period immediately preceding, or the three-months' period immediately following (and including the maturity date of then outstanding Corporation bonds) which, when added to cash and (d) and (e) securities, taken at their then market value, at least equals the principal of then outstanding Corporation bonds maturing within such period.

(C) If, after deducting the amounts of all securities which could properly be withdrawn under condition (B), there is no excess in the fund, and if the securities in the fund remaining after such deduction include any (a), (b) or (c) securities in default, then no securities which are not withdrawable under (B) can be withdrawn except only that (a), (b) or (c) securities in default may be withdrawn (but only on substitution of an equal amount of undefaulted securities of appropriate maturities or to permit collection of the securities so withdrawn, through foreclosure, etc., for the fund) and that (a), (b) or (c) securities not in default may be withdrawn only to permit the collection for the fund of such undefaulted (a), or (b) or (c) securities "in connection with their redemption or final payment at maturity." In this context, the word "excess" means the amount by which (a), (b) and (c) securities not in default, taken at their face value, plus cash and (d) and (e) securities, taken at their then market value, exceeds the principal amount of all then outstanding Corporation bonds. The Corporation can withdraw cash or (d) or (e) securities equal in value, or (a), (b) or (c) securities equal in principal amount, to the principal amount of its bonds presented to the trustee for cancellation, but only if the three foregoing conditions are satisfied; thus, inter alia, unless an excess exists, a withdrawal cannot be made, against the delivery of cancelled bonds, of

securities (or their proceeds) withdrawn or withdrawable only for collection.[2]

■ Our reasons for this interpretation are as follows: Article I, § 2, provides that each bond and mortgage of type (a) delivered to the trustee as part of the trust fund must be accompanied by an affidavit of a corporation officer that it is not in default as to payment of principal or interest. Article II, § 2, relating to the authentication and issuance of corporation bonds, provides: "So long as the Corporation shall not have been in default hereunder for a period of eighteen months, the Corporation shall have the right to issue, and the Trustee at its request from time to time shall authenticate and deliver, Prudence-Bonds in any maturity, provided that at the time of such authentication there shall be in the Trust Fund a principal amount of securities deposited under paragraphs (a), (b) and (c), Section 1, Article I hereof, maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity day of the Prudence-Bonds then requested to be authenticated, which, together with the amount of cash and securities deposited under paragraphs (d) and (e) of said Section 1, Article I, at their market value as of the date of deposit, shall at least equal the aggregate principal amount of the Prudence-Bonds then requested to be authenticated and all other Prudence-Bonds issued hereunder of even maturity date therewith. Prudence-Bonds of any maturity may be issued, authenticated and delivered against any cash and securities deposited under paragraphs (d) and (e) of said Section 1, Article I." Obviously it was the intent that Corporation bonds could not be issued in amounts not matched by cash or (d) or (e) securities plus face amount of (a), (b) and (c) securities "maturing during the six months", etc., and which were not in default. For to construe this provision to permit bonds to be authenticated and issued against (a), (b), or (c) securities which were in default would be to impute to the Corporation and the Bank an intention which verges on dishonesty, and it is therefore an interpretation not to be adopted unless (as is not the case here) no other is possible. Consequently, the phrase "maturing during the six months" etc., in Article II, § 2, must be interpreted

---

[2] The sole exception is found in Article III, § 1(i) which we shall later discuss.

as meaning that such (a), (b) and (c) securities were not at the time in default. That interpretation of the phrase has marked significance. For we find it, accompanied by almost identical language, in the release clause.

The Bank, however, contends that, when an installment of the principal of a mortgage is in default, the quantum of the default, for purposes of the release clause, must be limited to that installment. We cannot agree. We think that, as the Master held, the clear intention was that, for this purpose, if one installment went unpaid when due, the entire amount of the principal of that mortgage should be regarded as in default.

The Bank refers to that part of the release clause which speaks of substituting securities "authorized by Section 1 of this Article equal in amount or value as prescribed by Section 4 of this Article to the unpaid principal of the bonds, mortgages, or other securities or cash withdrawn." This language, says the Bank, incorporates in the release clause all of Article I, § 4,[3] which, says the Bank, for all purposes of the instrument provides that (a), (b) and (c) securities shall be taken at their face amount "irrespective of whether any thereof are overdue or in default as to principal or interest." But were this true, the release clause would in all circumstances permit the substitution of mortgages in default for undefaulted mortgages or cash. Such an interpretation would lead to so unreasonable a result that it should not be adopted if avoidable. It is avoidable: (1) The reference in the release to Article I, § 4, was, we think, intended merely to say that (a), (b) and (c) securities should be taken at their face amount, and (d) and (e) securities at their market value.[4] (2) That reference in the release clause to Article I, § 4, is preceded by a reference to securities "authorized by Section 1 of this Article," and obviously that section called for the deposit of securities not in default. (3) That portion of the second sentence of Article I, Section 4, which states that (a), (b) and (c) securities are to be taken at their face amount regardless of whether or not they are in default is to be read in association with the first sentence, and also with the provision of Article II, Section 1 (which provides that the aggregate principal amount of the Corporation's bonds at any time outstanding shall not exceed the principal amount of the trust fund and shall not exceed $5,000,000); therefore we think that that portion of the second sentence of Article I, Section 4, was meant, first, to protect the Corporation against demands for additional collateral, if (a), (b) or (c) collateral were in default or (d) and (e) securities declined in market value; and second, to define the rights of the Corporation to make collections under Article I, § 5.[5]

The Bank contends that the third condition, which we have called (C), even when there exist the facts, above described, which make it operative, requires merely that, as long as any (a), (b) or (c) securities are in default, the Corporation cannot withdraw any (a), (b) or (c) securities which are not in default (except for collection in connection with their redemption or final payment at maturity) and that this third condition in no way prevents the withdrawal of cash or (d) or (e) securities. Such an interpretation would lead to

---

[3] That Section reads as follows: "Section 4. Amount and Computation of Trust Fund—The aggregate principal amount of the Trust Fund as herein created and determined shall at no time exceed the sum of Five Million ($5,000,000.00) Dollars, but may, at the option of the Corporation, be for any amount less than Five Million ($5,000,000.00).

"In determining and computing the aggregate principal amount of the Trust Fund at any time, there shall be included all securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, at their face principal amount irrespective of whether any thereof are overdue or in default as to principal or interest (but less any payment shown to the Trustee to have been made on account of principal thereof), and all bonds and other securities deposited under paragraphs (d) and (e) thereof at their market value as of the date of deposit."

[4] Cf. the authentication provision in Article II, § 2, which refers to "the principal amount" of (a), (b) and (c) securities. Obviously there the words "principal amount" could not have meant the principal amount of mortgages in default.

[5] That section says that such collections may be made "when the aggregate principal amount of the trust fund is not less than the principal of all Prudence-Bonds then issued and outstanding hereunder, etc."

The provisions of Article I, § 4, may perhaps have had other functions.

such unreasonable results as to preclude it. For it would mean that, when the third condition was operative, a $50,000 mortgage not in default could not be withdrawn (unless for collection when it matured or was called for redemption), but that, when that same mortgage came due and was paid, then the cash thus· paid, having been deposited by the Corporation with the Bank, could at once be withdrawn. It would be unreasonable to think that the parties would provide that a nondefaulted mortgage could not be withdrawn, but that a cash substitute therefor could be. The Bank further argues thus: It is not reasonable to suppose that the parties intended that, when condition (C) was operative, the Corporation· could withdraw for collection undefaulted (a), (b) or (c) securities which were redeemed or matured but could not similarly withdraw for collection (d) or (e) securities which were redeemed or called; consequently the language of the release clause relating to that sort of withdrawal must be restricted to (a), (b) and (c) securities and therefore the entire third condition must likewise be so restricted; wherefore this third condition does not restrict any kind of withdrawal of anything but (a), (b) or (c) securities. We cannot agree. Securities of types (d) or (e) would ordinarily be presented to a bank or other depository for payment, and the act of procuring the cash for the trust fund could readily be performed by the trustee, a bank, without releasing the securities to the Corporation; but, on redemption or final payment of mortgage collateral, a closing would generally be necessary, with the accompanying delivery of the original mortgage documents and the execution and delivery of a satisfaction piece or assignment of the bond and mortgage; it was therefore reasonable to provide for withdrawal of such securities, but not of (d) or (e) securities, for collection for the fund on redemption or final payment.

■ We think that the release clause, as we have construed it, expresses the agreement's dominant purpose [6] in the light of which its other provisions to which the

Bank refers must be interpreted. Cf. Prudence Company, Inc. v. Central Hanover Bank & Trust Co., 237 App.Div. 595, 600, 601, 262 N.Y.S. 311, 317,[7] affirmed 261 N. Y. 420, 185 N.E. 687; Citizens Banking Co. v. Monticello State Bank, 8 Cir., 143 F.2d 261, 266.

■ Thus, because of that ·dominant purpose, we reject the following contention made by the Bank: Releases of cash and securities at times when the conditions of the release clause were unsatisfied were not improper because the Corporation could properly have procured such releases (although it did not) under other provisions of the agreement; we reject that contention even assuming, arguendo, (a) that such other provisions, if standing alone and literally construed, would have so permitted (which is by no means clear) and (b) that it is sound reasoning that a violation of the release clause should be excused because the same result perhaps might properly have been achieved under other clauses of which in fact the Bank and the Corporation did not seek to avail themselves. We note, as to the second of these assumptions, that with respect to a similar argument, we said in another context (per L. Hand, J.), "Whatever they might have done, they did what they did." Nixon v. Lucas, 42 F. 2d 833, 834; cf. Davis v. Garrett, 6 Bing. 716, 724, 130 Eng.Rep. 1465, 1469.

■ The Bank points particularly to the provision of Article III, § 1(i), permitting the Corporation to deliver to the trustee, in lieu of the cash which the Corporation collected for the trust fund on the principal of bonds constituting the fund, "an equal amount of Prudence Bonds * * * maturing within six months after the date" of the monthly statement of such collections made by the Corporation to the trustee. We agree with the Master that this provision, especially when read in the light of the release clause and the paramount purpose of the trust agreement, applies only to bonds maturing "within six months after the date" of a monthly statement, and does not include bonds which matured on or before that date.[8] The cases cited by the

---

[6] The agreement throughout shows that the trust fund was equally to· secure all the bonds.

[7] There the court said: "The bank is not a mere depositary. It is a trustee. Its duty is to make certain, as far as possible, that the trust shall attain its end. In the absence of an unequivocal stipulation to the contrary, no provision of the trust agreement shall be so read as to defeat its purpose * * *. The agreement must be considered in its entirety, having in mind its purpose * *."

[8] We shall later discuss Article III, § 1(i) in another respect.

Bank of which Davies v. Miller, 130 U.S. 284, 9 S.Ct. 560, 32 L.Ed. 932, and Colonial Trust Co. v. Wallace, C.C., 183 F. 897, are typical, related to statutes or agreements where the context plainly showed a different intention.[9]

We see no reason not to accept the Master's finding that "the bank was guilty of no fraud in committing the acts complained of." However, we also agree with him that that fact does not exculpate the Bank for release of trust funds in violation of the trust agreement.

A violation of any of the three conditions of the release clause made the Bank liable. The Master's interpretation of the first two of these conditions—which we have called (A) and (B)—accords with ours.[10] We are not entirely clear whether his interpretations of the third condition—which we have called (C)—is wholly the same as ours, and whether, if it is not, and if our interpretation were applied, the result would be more favorable to the Bank. While we are inclined to think that there will be no such difference, we shall, for the present, withhold our decision and mandate, with permission to the Bank to file with us within seven days, if it so desires, a brief setting forth in detail facts (with reference to the record and the exhibits) in an effort to show that our construction will yield a result more favorable to it.[11]

Should the Bank file such a brief, the other parties may file answering briefs within seven days thereafter. Subject to the foregoing, we agree with the conclusions of the Master and the trial court except as indicated in the balance of this opinion.

3. The Master, as to the Fifth Series, held the Bank accountable for the face amount of mortgage B & M 5-559, which seems clearly to have been withdrawn in violation of the second condition of the release clause. The Bank asserts that this conclusion was in error, basing its argument upon the contention that another mortgage, B & M 5-449, must be considered as then in default only to the extent of its then defaulted installment. As already stated, such a contention is unfounded.

Moreover, the entire principal of B & M 5-449 had become due, as a result of foreclosure, on December 16, 1931, three days before the withdrawal of B & M 5-559. The Bank asserts, however, that, on that latter date, it did not know of the foreclosure of B & M 5-449. But, as the Bank, when it permitted withdrawal of B & M 5-559, had received from the Corporation no written representation that the state of the fund satisfied the conditions of the release clause, it cannot rely on lack of knowledge of a fact which it could easily have learned by inquiry.[12]

---

[9] The paramount intention of the trust agreement also negates the bank's suggested interpretation of the provisions dealing with the redemption and authentication of bonds; according to the Bank, these provisions could have been employed to accomplish what we hold to be violations of the release clause. We think that there are possible interpretations of the redemption and authentication provisions which would have prevented such results.

[10] He describes (A) but does not refer to it as a condition. Accordingly, the two "conditions" to which he refers correspond to our (B) and (C).

[11] For instance, inter alia, as to the last date on which the fund was in the condition which the Master called "sweet."

[12] While it is by no means of controlling significance, we note that, on January 5, 1929, the Bank's counsel wrote it a letter reading as follows: "We are in receipt of your letter of December 29, enclosing letter from the Prudence Company, Inc. together with proposed assignment of mortgage in the amount of $700,000.00, made by Boardwell Realty Corporation and held by you, pursuant to trust agreement, Fifth Series. We understand that you wish our opinion as to whether or not it is proper for you to execute the proposed assignment within the terms of the Trust Agreement.

"Article I, Section 6 of the Trust Agreement provides that bonds and mortgages may be withdrawn, from the trust upon the written application of the Corporation, provided the principal amount of the trust fund exceeds the par value of the Prudence-Bonds then issued and outstanding, pursuant to such agreement; and further provided that after such withdrawal, you retain securities sufficient in principal amount maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity date of any Prudence-Bonds then issued and outstanding under such trust agreement, to at least equal the principal amount of Prudence-Bonds then issued and outstanding thereunder, maturing within such period.

"The letter of the Prudence-Bonds Corporation does not make any represen-

474

4. The Bank complains that the Master improperly excluded evidence which it offered to show that another bank, acting as trustee under another series, permitted conduct by the Corporation said to have a bearing on the issues here. Of course, any such evidence was irrelevant, since, for all we now know, that other bank may also have acted improperly.[13]

On the other hand, the Master, in construing the agreement, properly considered the relevant conduct of the Bank which is here accounting.[14]

5. The Bank contends that the New York decisions restrict the right of suit to those bondholders who held their bonds at the time that the wrong was committed by the trustee. This court, in another chapter of this litigation, has heretofore held that, under the New York decisions, this rule is inapplicable to such proceedings as this, brought against the trustee for the restoration of the trust fund. Brooklyn Trust Company v. Kelby, 2 Cir., 125 F.2d 650. It is now urged that Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823, recently decided, shows that this distinction was erroneous. But in the Smith case, the trustee did not surrender any portion of the res; the suit was brought by individual bondholders against the trustee for its negligence in not protecting the trust fund in that the trustee neglected to take action in a foreclosure proceeding. The Court, in the Smith case, referred to the Emmerich case [Emmerich v. Central Hanover B. & T. Co., Sup., 34 N.Y.S.2d 166, affirmed 265 App.Div. 808, 37 N.Y.S.2d 434; Id., 291 N.Y. 570, 50 N.E.2d 659], which was considered by us in Brooklyn Trust Company v. Kelby, supra, as holding that the rights of bondholders "in the case of a breach of

fiduciary duty *not involving a surrender or release of the mortgaged property*" are "purely personal to each bondholder" and "exist independently and without regard to the mortgaged property."[15] [292 N.Y. 275, 54 N.E.2d 824.] In commenting on another of the New York cases (cited by us in the Manufacturers Trust case), the New York Court of Appeals said in the Smith case: "In Hendry v. Title Guaranty & Trust Company, 255 App.Div. 497, 8 N. Y.S.2d 164, affirmed 280 N.Y. 740, 21 N.E. 2d 515, certificateholders sued defendants for breach of duty in releasing a condemnation award to a mortgagor. The Appellate Division said (page 500 of 255 App.Div., page 167 of 8 N.Y.S.2d), 'The cause of action for that breach of trust did not pass from hand to hand with the certificate.'" But, as we had pointed out (125 F.2d at page 652), in the Hendry case the suit was by a participating certificateholder, not by a bondholder against a trustee holding trust assets; there the trustee was merely holding the mortgaged documents as agent and depositary for the certificateholder; for this distinction, see Strebler v. Title Guaranty & Trust Co., 277 N.Y. 730, Mem.Op. 14 N.E.2d 824; Fisher v. Title Guaranty & Trust Co., 176 Misc. 166, 26 N.Y.S.2d 960, reversed on other grounds, 262 App.Div. 293, 28 N.Y.S.2d 410, affirmed 287 N.Y. 275, 39 N.E.2d 237. The plaintiff in the Hendry case, therefore, was not seeking a restoration of a trust fund but damages for the injury to his property by the custodian. Accordingly, the language of the Smith case with reference to the Hendry case is not pertinent here. The Smith case we regard as in accord with our prior analysis of the New York law on this point both in the Manufacturers Trust Company case and also more recently, in York v. Guaranty Trust Company, 2 Cir., 143 F.2d

tation to this effect. If you are satisfied that this is the situation in the absence of such a representation, we are of the opinion that you may properly execute the proposed assignment. Unless you are certain that such is the situation, our advice would be that you have an additional letter, written by the Prudence-Bonds Corporation to you, making such a representation."

There is no evidence that the Bank consulted counsel in connection with the withdrawal of B & M 5–559.

13 If we were to consider any such evidence, we would also consider the fact that several other banks, trustees under other issues, have settled the claims

against them with the result that, as the trial judge noted, more than $1,000,-000 has been restored to the other trust funds; but of course that fact cannot affect our decision.

14 While we do not rely on the fact in reaching our decision, we note that the Bank called none of its employees as witnesses to explain its conduct, and that perhaps the explanation, partly at least, lies in the fact that the Bank relied upon what it regarded as the ample solvency of the guarantor, The Prudence Co. Inc., to which the Bank, in its capacity as a bank and not as trustee, made several large unsecured loans.

15 Emphasis added.

503, 521, where (citing the Smith and other New York cases) we said that under the New York decisions "only the person who owned the notes at the time when the breach of trust occurred can maintain an action because of such breach since the action does not involve any charge of releasing any trust assets on which the notes were a lien." See also Elias v. Clarke, 2 Cir., 143 F.2d 640, 644.

6. Assuming, arguendo, that, as to the Fifth Series, there were, as the Master found, no violations before June 30, 1931, but that there were thereafter, the Bank has argued that, in any event, no damage resulted to the trust fund.[16] The Master said that the Bank "arrives at this conclusion by attempting to show that the present-day values of the residue of real estate covered by the defaulted mortgages, together with the principal cash received by the New Company from said mortgages, aggregate more than the so-called excess cash extracted after June 30, 1931. But the answer is plain. Since there was no excess collateral, neither the cash nor the mortgages could have been extracted legally; both should have remained in the Trust Fund. And even if both had been permitted to remain, it is very doubtful if the Trust Fund would have been rendered solvent. * * * Besides, the present-day values of the properties reflect an additional investment of servicing costs and skill by the New Company. Accordingly, the proffered evidence of present-day values was excluded." We concur in this reasoning.

7. The Bank contends, however, that the rule in New York is that, except in cases of fraud or self-dealing, "a trustee may not be surcharged for a breach of trust unless damage to the trust fund or the beneficiary is shown to have resulted therefrom." An examination of the New York cases reveals no such general rule. The New York courts have not surcharged the trustee where an investment in a nonlegal security became a legal investment before any fall in the value of the security.[17] And in one case where the trustee failed to give the required notice to the beneficiaries of the purchase of a share in a mortgage, the court refused to surcharge the trustee.[18] But generally where the trustee has failed to give notice of a purchase of a participating share in a mortgage he has been surcharged.[19] And where the trustee has made illegal investments[20] or has been guilty of self-deal-

---

[16] The Bank made a similar argument as to the Ninth Series, the date alone being different.

[17] Matter of Adriance's Estate, Surr. Ct. Kings County. 1932, 145 Misc. 345, 260 N.Y.S. 173; Matter of Turner's Estate. Surr.Ct. Orange County, 1935, 156 Misc. 68, 281 N.Y.S. 452: Matter of Toel's Estate, Surr.Ct.N.Y.County, 1943, 39 N.Y.S.2d 898.

[18] Irving Trust Co. v. Natica, Sup.Ct., N.Y. County, 1935, 157 Misc. 32, 284 N.Y.S. 343. The court in this case held that the delay in giving notice was reasonable and relied at least as much on this ground as on the theory that there was no causal relationship for exonerating the trustee.

The Bank also relies on a dictum of a Kings County Surrogate in a case in which the Surrogate found no breach of trust but went on to state: "Inasmuch as the objectants have not sustained the burden of proving that the loss claimed to have been suffered by the trust was proximately caused by some act, fault, or omission of the trustee [citations], the objections are dismissed." Matter of Beebe, —— Misc. ——, 52 N.Y.S.2d 736, 741.

[19] Matter of Prime. 1939, 278 N.Y. 601, 16 N.E.2d 119; affirming 2nd Dept. 1938, 254 App.Div. 685, 3 N.Y.S.2d 414; Matter of Roche's Will, 4th Dept.1935, 245 App.Div. 192, 281 N.Y.S. 77; Matter of Gerbereux's Ex'r, 2nd Dept. 1936, 249 App.Div. 751, 292 N.Y.S. 986; affirmed 1937, 274 N.Y. 495, 10 N.E.2d 517; Matter of Bearns, 1st Dept. 1937, 251 App. Div. 222, 295 N.Y.S. 618; affirmed 1937, 276 N.Y. 590, 12 N.E.2d 590; Matter of Peene's Estate, Surr.Ct. Westchester County 1935, 155 Misc. 155, 279 N.Y.S. 131; Matter of Jones' Estate, Surr.Ct. Westchester Cty. 1935, 155 Misc. 315, 280 N.Y.S. 521; Matter of Dimond's Estate, Surr.Ct.N.Y.Cty.1937, 163 Misc. 611, 297 N.Y.S. 969; Matter of Ryan, Surr.Ct.N.Y.Cty.1940, 181 Misc. 566, 48 N.Y.S.2d 522. In the Ryan case the court said: " * * * the beneficiary is not required to show loss traceable to the failure to give notice. Even proof by the trustee that the loss was due to causes other than such failure will not save him from surcharge." 181 Misc. at page 580, 48 N.Y.S.2d at page 536.

[20] Matter of Roche's Will, 4th Dept. 1935, 245 App.Div. 192, 281 N.Y.S. 77; Matter of Jones' Estate, Surr.Ct.Westchester Cty.1935, 155 Misc. 315, 280 N.Y. S. 521; Matter of Schmidt's Estate, Surr.Ct.N.Y.Cty.1937, 163 Misc. 156, 297 N.Y.S. 328.

ing,[21] though no cause and effect relationship could be established, the trustee has been held liable.

 But the New York cases do not provide an explicit underlying rationale which would govern the situation in the instant case. It has been suggested that "the trustee is not subject to surcharge unless the breach is of such a character that it is necessary to impose an absolute liability on the trustee in order to deter trustees from committing similar breaches of trust."[22] The decisions of the New York courts, although not clearly enunciating this doctrine, would seem to fall within its scope. Adopting this rationale, we think that the acts of the Bank here were such that it should be surcharged.[23]

8. The Bank argues that its liability to account, if any, should be limited in this way: The situation must be so reconstructed that it can be estimated what would have been the recovery on behalf of each of the now outstanding bonds of the Corporation if none of its bonds had been paid off as the result of improper withdrawals. But the difficulty is that no one can tell what the situation would have been in those circumstances. Thus, if the Bank in the early stages had prevented withdrawals in violation of the release clause, this whole Series might have been liquidated before the Great Depression had progressed far, and, in that way, all of the bonds might have been paid in full. This goes to show that the Bank cannot now demonstrate what, had it not released trust assets in violation of the trust agreement, would have been the loss to the holders of the presently outstanding bonds.

 This case is governed by the rule that, where one has committed a wrong which renders impossible the exact ascertainment of damages, "the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. * * *" Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 51 S.Ct. 248, 251, 75 L.Ed. 544. We recently held that rule applicable to a wrongdoing trustee. York v. Guaranty Trust Company, 143 F.2d 503, 517.[24] We should not indulge in conjectures to lighten the burdens of such a trustee at the expense of its beneficiaries.

 The proceedings here, as we have said,[25] are for the restoration of the trust fund, not for damages to the individual holders of bonds. The Bank must restore to the fund what was withdrawn from it

---

[21] King v. Talbot, 1869, 40 N.Y. 76; Matter of Olney's Estate, 4th Dept. 1938, 255 App.Div. 195, 7 N.Y.S.2d 89; Matter of Pelton's Estate, 4th Dept. 1942, 264 App.Div. 176, 35 N.Y.S.2d 194; Matter of Haydock's Estate, Surr.Ct. N.Y.Cty.1935, 158 Misc. 404, 284 N.Y.S. 931; Matter of Dimond's Estate, Surr. Ct.N.Y.City 1937, 163 Misc. 611, 297 N.Y.S. 969.

[22] 2 Scott, Trusts (1939) § 205.1.

[23] Another solution has been suggested: If the act of the trustee is of itself an injury to the trust res, requiring no further act or event to create the damage, then the trustee should be surcharged and not otherwise. See Note (1939) 50 Harv.L.Rev. 317. Adopting this suggestion, the trustee in the instant case would still be liable, since the surrender of a part of the trust res is an injury to the trust.

York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, which was not a suit for the restoration of the trust fund, did not present a breach of such a character to make it proper to impose an absolute liability on the trustee.

[24] Certiorari has been granted but significantly not as to that point.

See also Package Closure Corp v. Seal-

right, 2 Cir., 141 F.2d 972, 979; Great Southern Gas & Oil Co. v. Logan, etc., Co., 6 Cir., 155 F. 114, 115; Lincoln v. Orthwein, 5 Cir., 120 F. 880, 886; cf. F. W. Woolworth Co. v. N. L. R. B., 2 Cir., 121 F.2d 658, 663; The Pennsylvania, 19 Wall. 125, 136, 138, 22 L.Ed. 148; The Vallescura, 293 U.S. 296, 307, 55 S.Ct. 194, 79 L.Ed. 373; Strauss v. Victor Talking Machine Co., 2 Cir., 297 F. 791, 802.

We here cite, inter alia, some admiralty cases. We note in passing that many admiralty opinions contain useful learning of general application which, unfortunately, is usually ignored by those who are not members of the Admiralty Bar, in part because of the way in which the digests pigeonhole the admiralty precedents. It is of interest that the so-called "six-months' rule" in railroad receiverships was apparently taken over from admiralty. See Fairman, Mr. Justice Miller (1939) 242, 245; Hume v. Moore-McCormack Lines, 2 Cir., 121 F. 2d 336, 345.

[25] See Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, 108-112, certiorari denied 319 U.S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717, summarizing our earlier decisions.

through the Bank's misconduct. It is against the fund, as it will be when restoration has been made, that the bondholders will assert their claims for the unpaid principal of, and interest on, their bonds. If realization on assets now in the fund, plus the restoration by the Bank, leaves an excess, then of course the Bank will be entitled to the excess.

■ 9. The Master held that some of the cash was improperly withdrawn by the Corporation in exchange for its bonds which were cancelled; that the Bank must be considered as having invested its own funds in those bonds; and that, upon the Bank's payment to the fund of the sums for which it must account, the Bank should have a lien on the fund "subordinate to the publicly-held bonds and in parity with the subordinated bonds" now held by Prudence Realization Corporation which it acquired as successor and as the result of the reorganization of the guarantor, Prudence Co., Inc. We agree with the Master that the Bank's lien should be subordinated to that of the "publicly held bonds."[26] But we do not agree that its lien should be on a parity with that of those bonds now held by Prudence Realization. For, absent any special agreement on the subject, those bonds would have had a lien on a parity with all other publicly-held bonds. Prudence Realization Corporation v. Geist, 316 U.S. 89, 62 S.Ct. 978, 86 L.Ed. 1293. Their lien would thus have ranked ahead of that accorded the Bank. But by a compromise agreement, in connection with the reorganization of the Corporation, it was agreed that the bonds held by the guarantor (and now held by Prudence Realization) should be subordinated in lien to all the Corporation's publicly-held bonds. We think that the bonds acquired by the Bank do not come within that category. The lien of those bonds should therefore be subordinated to that of all other bonds including those held by Prudence Realization Corporation.

■ 10. Appellees advance the following contention: (1) In Article III, § 1(f) the Corporation covenanted to deposit with the trustee a guarantee by Prudence Co., Inc., of the payment of principal and interest of all (a), (b) and (c) collateral. (2) The Corporation breached this covenant. (3) Under Article IV, § 1(c), an "event of default" would exist if the trustee notified the Corporation of a breach of any of its covenants and the breach continued for 90 days. (4) True, the trustee was not obligated to give such notice unless holders of 25% of the outstanding bonds notified it of such default and requested it to give such notice. But, as the trustee knew of the breach, and no bondholders did, and as the trustee did not advise the bondholders of the breach, therefore, so far as the Bank is concerned, it must be deemed that it gave the notice of breach to the Corporation. (5) Accordingly, the situation was as if "an event of default" existed shortly after the trust agreement was executed. (6) The first condition of the release clause was that there should not exist "an event of default under which the trustee may take action." (7) Consequently, virtually all the withdrawals were in violation of that condition.

But, assuming arguendo the soundness of steps (4) and (5) of this reasoning,[27] still the argument must fail: (a) The trust agreement provides that The Prudence Co., Inc., shall give, and it did give, a guarantee of the prompt payment of the interest on each of the Corporation's bonds and the payment of the principal of each such bond within eighteen months after it became due by its terms. (b) Article IV, § 1 (d), referring to that particular guarantee, provides that "no rights or remedies under this Article shall be exercised by the trustee or by any bondholder * * * unless and until The Prudence Company, Inc., shall have failed to fulfill some obligation in said guarantee contained, anything in this agreement or in said Prudence-Bonds con-

---

[26] To hold otherwise would be to hold, in effect, that the Bank, by now restoring the cash withdrawn and used for that purpose, will fully restore the status quo, a holding which would be in error for the reasons stated above in point 8 of this opinion.

[27] They are not sound unless there may be disregarded the exculpatory provision that the trustee "shall not be accountable for the performance of any covenant" of the Corporation and the provi- sion that the trustee need not give notice of a breach unless requested to do so by holders of the prescribed amount of bonds. A court, in some circumstances, might disregard such provisions. Seelig v. First Natl. Bk. of Chicago, D.C., 20 F.Supp. 61, 68. But the facts there were substantially different and it is by no means clear that those provisions could be ignored. However, we need not here pass on that question.

tained to the contrary notwithstanding." (c) Therefore, even if "an event of default" existed there could be no "event of default on which the trustee may take action" until, at least, the Corporation and the guarantor failed to pay interest or eighteen months after the Corporation and the guarantor failed to pay the principal of any of the bonds when they came due according to their terms. (d) But, in fact, there were no withdrawals after such dates. (e) Accordingly, no matter what the Bank might or should have done as to the Corporation's breach, the first condition of the release clause was not violated by reason of such breach.

██ Appellees also suggest that the Bank improperly authenticated the Corporation's bonds because, before authentication, there was not in its possession the guarantee of (a), (b), and (c) collateral in the trust fund. But neither Article I, § 1, which describes the required contents of the trust fund, nor the associated Article I, § 2, which describes the instruments which must accompany mortgage collateral, refers to that guarantee.

██ Appellees also urge that the Bank is liable for damages resulting from its failure to enforce the Corporation's covenant to deposit that guarantee. It may be that such damages were considerable; for, had that guarantee been procured promptly, the guarantor might have made good the defaulted mortgages when it was still amply solvent. But, assuming arguendo, that the exculpatory clauses would not be a defense, yet an action for those damages is not one for restoration of the fund; it therefore comes within the rule of Smith v. Continental Bank & Trust Co., supra;[28] and it cannot be maintained in connection with the bankruptcy proceedings.[29]

██ 11. The Ninth Series trust fund, in August, 1931, included mortgage B & M 9–773 in the principal amount of $59,500, which was in default in payment of interest and taxes. The Prudence Company, Inc., under Article I, § 5, withdrew the mortgage and instituted an action, in the name of the Bank, as trustee, for the partial foreclosure of that mortgage; $17,000 was called for payment. At the foreclosure sale, the Prudence Company, Inc., bought in the property and assigned its rights under that purchase to a wholly owned subsidiary. In September, the Prudence Company set up on its books an account receivable of $22,136.83 due from its subsidiary, representing principal and interest on mortgage B & M 9–773. The trust fund retained mortgage B & M 9–773, in face amount of $42,500. To make up the difference of $17,000, the Corporation delivered to the Bank mortgage B & M 9–8934 for $12,500, together with $3,100 cash and $1,400 of Corporation's bonds for cancellation. The Bank accepted these items as payment of $17,000 on account of the principal of mortgage B & M 9–773. The Master correctly found that the fund was entitled to $12,500 in cash, and that the agreement did not give the Bank authority to accept any (a), (b) or (c) securities instead of such cash. The Bank argues that it could not have obtained this cash without suit and that, under the terms of the trust agreement, the Bank was not required to bring any suit "which, in its opinion, shall be likely to involve it in expense or liability," without indemnity and until a request for such action by holders of 25% of the outstanding bonds, and that to accept the mortgage was better than to receive nothing. But, as the evidence shows no demand for the cash (i. e, no effort whatever to obtain it without suit), this excuse will not serve. Moreover, there is no evidence that the Bank accepted the mortgage in place of cash because it had arrived at the opinion that otherwise it was likely to be involved in litigation causing expense or liability to it. In other words, the Bank did not, in fact, exercise the discretion it had. The Master correctly surcharged the Bank for the $12,500.[30]

██ 12. Notice was given by the Pru-

---

[28] Cf. York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 520, 521.

[29] Cf. Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, 111.

[30] It might perhaps be suggested that there was no loss in fact since the Corporation could have delivered to the Bank the $12,500 and then, under the release clause, substituted the mortgage for that cash. But the fund was not then in condition to permit such a maneuver. Nor can it be successfully contended that this claim against the Bank as trustee is merely one for damages; for the Prudence-Company, Inc., in foreclosing the mortgage, was, under Article I, § 5, acting as agent for the trustee, and the action therefore is for restoration of the fund.

dence Company, Inc., on January 2, 1932, that, while interest on the Corporation's bonds would continue to be paid, there would be no further payment of the principal of its bonds as they fell due. After this notice, the Corporation, in lieu of cash which the Corporation had collected on the principal of some of the mortgage collateral, delivered to the Bank for cancellation some of the Corporation's bonds which it had purchased with that collected cash. The third paragraph of Article IV, § 1 (d), provides that, until Prudence Company, Inc., failed to fulfill some of its obligations under its guarantee of payment of interest and principal of the bonds, neither the Corporation nor the guarantor should be prevented from exercising any rights conferred upon either of them, anything in the agreement to the contrary notwithstanding. The second paragraph of that same subsection, however, provides: "In the event of the inability of the Corporation to pay at maturity or within eighteen months thereafter the principal and interest of any Prudence-Bonds issued and outstanding hereunder, the Corporation shall have the right during such period to pay in part, pro rata, the principal past due and unpaid upon all such Prudence-Bonds, with the accrued interest on the amount so paid. Such payment shall be noted on such Prudence-Bonds and interest on the amount of principal so paid shall cease. Such bonds shall be considered in default with respect to the unpaid principal and interest thereof and in respect thereto shall continue to have the benefit and be subject to the terms and conditions of this Agreement and of the guarantee of The Prudence Company, Inc." The Bank argues that its acceptance of such bonds for cancellation in lieu of cash was not improper, because there were then no violations of the release clause and especially because, under the third paragraph of Article IV, § 1(d), there still remained in the Corporation for eighteen months after January 2, 1932, the right to deliver, in lieu of collected cash, its cancelled bonds pursuant to Article III, § 1 (i).

We agree with the Master that no such right existed, in any event, as to bonds not "maturing within six months" under Article III, § 1(i).[31] We also agree with the Master that the release clause and the third paragraph of Article IV, § 1(d), must be read in connection with the second paragraph of that subsection; that therefore the only right which, after January 2, 1932, remained in the Corporation as to payments of principal of bonds was that conferred by that second paragraph, i.e., to make pro rata payments on the principal; and that consequently the Bank should not have accepted the bonds for cancellation in lieu of the cash which the Corporation had collected.

The Master nevertheless held that there was no liability because the Bank could not have obtained this cash without suit against the Corporation, and there was no request by the requisite number of bondholders to bring suit and no offer of indemnity. But the evidence here on that issue is the same as that with respect to mortgage B & M 9-773 discussed above, and, for the reasons stated with respect to that item, this excuse will not serve. The Master was therefore in error in not surcharging the Bank as to these cancelled bonds.

13. Appellee Eddy urges that the court and Master erred in not charging the Bank with interest on each improper withdrawal from the date thereof.[32] We think it should be so charged. See Ellis v. Kelsey, 241 N.Y. 374, 150 N.E. 148; King v. Talbot, 40 N.Y. 76; Matter of Myers, 131 N.Y. 409, 30 N.E. 135; Matter of Baxter's Estate, 164 Misc. 183, 297 N.Y.S. 885.[33] Eddy also suggests that, considering the position taken by the Bank in the earlier phases of this litigation, it should be charged with the expenses of these proceedings, including counsel fees.[34] But that issue, under Federal Rules of Civil Procedure, 54(d), 28 U.S.C.A. following section 723c, is for the trial court.[35]

Affirmed in part and in part modified in

---

[31] See our discussion above of that provision.

[32] Exceptions to the Master's report on that ground were filed in the court below.

[33] Since there was no bad faith involved in the Bank's violation of the trust agreement, interest should not be at the full legal rate under the authorities above

cited, and the rate of interest is at the discretion of the trial court.

[34] He cites Matter of Hidden, 243 N.Y. 499, 154 N.E. 538, and April v. April, 245 App.Div. 841, 281 N.Y.S. 538, which are suggestive.

[35] Eddy, as a holder of bonds of the Fifth Series, was a proper party to the proceedings relating to that Series. Manu-

accordance with this opinion. The final decision and mandate are to be withheld, pending the filing of further briefs as indicated above.

Supplemental Opinion.

FRANK, Circuit Judge.

In our previous opinion we granted permission to file further briefs on the question of whether, under our construction of the instrument, there would be any decrease in the surcharge of the bank. Such briefs have now been filed.

The bank argues that it is entitled to a certain reduction approximating $30,-000, on the ground that, although at the time of certain releases made September 30, 1931, there was a deficit in mortgage collateral, yet, after allocating excess mortgage collateral matched against October 1, 1931 maturity to the April 1, 1932 maturity, there was excess cash collateral which could have been released.

This contention is grounded on the assumption that mortgage collateral allocated to October 1, 1931 maturity could be applied to the April 1, 1932 maturity. The instrument provides that, after withdrawal, there must remain sufficient mortgage collateral "maturing during the six-months' period immediately preceding or the three months' period immediately following and *including* the maturity date," [1] of the Prudence bonds, to meet those maturities. If the date from which maturity is to be measured were not to be included, then six months prior to April 1 would be October 1. It is true that the date from which maturity is to be measured would not be included in the computation if nothing in the agreement indicated otherwise. But, in the instant case, the agreement specifically provides for "including the maturity date," in making the computation. Thus; the six-months' period preceding April 1, 1932 does not include October 1, 1931. There-

fore the bonds allocated to the April 1, 1932 maturity cannot be allocated to the October 1, 1931 maturity. Accordingly, the bank's contention fails.

[1] Italics added.

facturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, 654, 655. As a holder of bonds of the Thirteenth and Eighteenth Series, he was also a proper party to the proceedings relating to the Ninth Series; for a considerable amount of Ninth Series bonds were part of the trust fund securing the Thirteenth and Eighteenth Series, and, for reasons stated in Brooklyn Trust Co. v. Kelby, 2 Cir., 134 F.2d 105, 108, 109, the trustee for those series had failed to assert any rights against the bank. It may be, although we need not

so decide, that some holders of bonds were necessary parties to these proceedings. Cf. Brooklyn Trust Co. v. Kelby, 2 Cir., supra, at pages 105, 109, 110, and note 8 of 134 F.2d. We note these facts by way of preface to the statement that, when the court below comes to fix counsel fees, it may wish to take into account the fact that Eddy's counsel, on previous appeals relating to the Fifth and Ninth Series and on the present appeals, has filed briefs which have been unusually helpful.