EDDY et al. v. PRUDENCE BONDS CORPORATION (New Company) et al.
No. 10, Docket 20589.

Circuit Court of Appeals, Second Circuit.

Dec. 8, 1947.

Writ of Certiorari Denied March 8, 1948.

See 68 S.Ct. 664.

Samuel Silbiger, of Brooklyn, N. Y., for George Eddy et al.

Edward C. Wallace and Weil, Gotshal & Manges, all of New York City, for James L. White et al.

Charles M. McCarty, of New York City, for Prudence Bonds Corporation (New Company).

George C. Wildermuth, of Brooklyn, N. Y., for the trustee of debtor.

J. M. Richardson Lyeth, of New York City, for Manhattan Bank.

Irving L. Schanzer, for Prudence Realization Corporation.

Maclay, Lyeth & Williams, of New York City (Robert L. Fay, of New York City, of counsel), for appellants President and Directors of Manhattan Co.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from four orders in bankruptcy in the reorganization of Prudence Bonds Corporation under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, a proceeding which has repeatedly come before this court. Three of the orders directed the distribution of the collateral,

which secured the Fifth, Sixth and Ninth Series of bonds issued by the Debtor, and the fourth order concerned the collateral of all the series but the Fifteenth. We may confine ourselves to the order which directed distribution of the collateral of the Fifth Series; and, indeed even more narrowly, to whether the Publicly Held Bonds of that series were entitled to interest in full up to the time of payment, as against the bonds in the hands of the Prudence Realization Corporation (the successor of the guarantor of all the bonds), as against any claim of the former trustee (the Manhattan Bank) or as against the New Company itself. As a result of our decision in President and Directors of Manhattan Company v. Kelby,[1] the Bank, as trustee for the Fifth Series, deposited with the substituted trustee for all the series over $1,500,000 which, with the remaining collateral, has created a fund large enough to pay the principal of the Publicly Held Bonds with interest in full up to August 1, 1945, and to leave a small surplus. The proper distribution of this fund depends upon the interpretation of the documents by which the Fifth Series was reorganized; and it will be enough to make our discussion intelligible, if in what follows we quote the relevant passages from these. However, it is desirable as a preliminary to state the positions of the parties and the conclusions of the special master which the judge affirmed. The Publicly Held Bonds argue that, although their right to interest as against the New Company was reduced to the income from the collateral, as lienors upon that collateral they retained unimpaired their claim to full interest. The Guarantor argues that, as lienors the Publicly Held Bonds were as much limited to the income from the collateral as they were as obligees of the New Company. The master held with the Guarantor, and there arose from this holding a number of other issues which become moot, when, as we are doing, we sustain the position of the Publicly Held Bonds.

By virtue of subdivision h of § 77B the order of confirmation discharged "the debtor from its debts and liabilities * * * except as provided in the plan or as may be reserved as aforesaid"; and it follows that no obligations remained except such as the New Company assumed. To learn what these were, we need look only at the Supplemental Trust Agreement, in which the New Company promised to pay interest only so far as the income of the collateral permitted,[2] and the principal when it became due;[3] and, in further confirmation of this, § 8 of Article II specifically exonerated the obligor from all deficiencies in interest which the income should not discharge. None of these clauses affected to deal with the claims of any of the bondholders as lienors upon the collateral; and a dispute had long since arisen between them and the Guarantor as to their relative rights as such. Section 11 of the original plan declared that the court should decide this dispute and went on to say that, if the Publicly Held Bonds were awarded priority, the Guarantor's Bonds should not "be entitled to receive any distributions on account of principal until all of the Publicly Held Bonds have been fully paid, redeemed, purchased or retired." On July 21, 1937, Judge Inch decided that the Guarantor's Bonds were "not entitled to share in the collateral * * * on a parity" with the Publicly Held Bonds; that the Guarantor's Bonds were "not enforcible obligations either as to principal or interest against their respective trust funds * * *, until" the Publicly Held Bonds should "have been paid or provided for in full, both as to principal and interest heretofore accrued or hereafter accruing"; and that they should be so entitled "if and when and only after" the Publicly Held Bonds should "have been paid or provided for in full, both as to principal and interest." The Guarantor appealed from this order, and the Amended Plan must have been drafted before the appeal was disposed of, for it incorporated in haec verba § 11 of the original Plan. The appeal was dismissed on January 7, 1938, by virtue of a settlement which accepted the order of July 21, 1937, so far as it fixed the terms of the subordination; and the Amended Plan was confirmed on January 18, 1938,

---

[1] 2 Cir., 147 F.2d 465
[2] § 1(a), Article V.
[3] § 1(c), Article V.

still without any change in § 11. The Supplemental Trust Agreement was drawn up thereafter and was executed as of March 1, 1938, though it was not approved until April 27, 1938. Two passages in Article II dealt with the subordination of the Guarantor's Bonds: § 8 declared at its close that they should "not be entitled to share in the Collateral until all other Bonds have been paid or provided for in full according to their tenor"; and § 10, that they should not "participate in proceeds of the Collateral * * * until the publicly owned or held Bonds have been fully paid, purchased or retired by the Corporation." This last language also appeared in an "allonge," affixed to the Guarantor's Bonds. All this had taken place before anyone knew, or at least before any of the bondholders knew, anything about the conduct of the trustee of the collateral—the Manhattan Bank—whose accounts were not filed until the summer or autumn of 1938. Then for the first time it appeared that it had been guilty of breaches of trust for which we finally fixed its liability on February 2, 1945, six years later. The recoveries so obtained are to be treated as restorations to the trust fund.

The order of July 21, 1937, having divided the bondholders into two groups, these were in the same relative position as though they had been secured by separate mortgages; and it would have been illegal to deny to the senior group its priority in interest, as much as it would have been to deny it its priority in principal.[4] If this proceeding had been a "straight bankruptcy," the preferred group would, moreover, have been entitled to full interest until payment, provided the collateral was large enough.[5] A pledgee acquires an interest in the pledge, which is not affected by the bankruptcy, for bankruptcy is no more than a means of dis-

tributing the debtor's general assets ratably.[6] The right which he acquires is intended to be security for his claim in full, and that includes interest till payment. In Ticonic National Bank v. Sprague, 303 U. S. 406, 58 S.Ct. 612, 82 L.Ed. 926, the court regarded it as a corollary of this general principle that the priority of creditors, preferred in the liquidation of a national bank, should include interest till payment; and, if there is a difference in the case at bar it must be because § 77B changed the law in the case of corporate reorganizations by limiting the interest on secured claims to the date when the plan goes into effect. There was nothing in § 77B(b) (5)[7]—the only relevant provision—which suggests such a change. It is true that subdivision (d) of § 77B(b) (5), among the methods by which the claims of all objecting creditors might be "dealt with" included such "as will in the opinion of the judge, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection"; and this "protection" the act had just defined as "adequate protection for the realization by them of the value of their interests, claims, or liens." That did permit the plan to "deal with" the claims of secured creditors by giving them new interests in the corporate property instead of paying them in cash; but it did not affect their right to have the substituted interests computed upon the basis of the "value" of the interests—the liens—cancelled.[8] Since the liens included interest to the date of payment, the substitute, to be lawful at all, had to include interest to the same date. Indeed, in the case of Chapter X, 11 U.S. C.A. § 501 et seq.,[9]—which in this regard is substantially identical with § 77B(b) (5), (d)—the Supreme Court recognized as much in its discussion in Vanston Bondholders Protective Committee v. Green.[10] Hence it would have been illegal to deny

---

[4] Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 527, 528, 61 S.Ct. 675, 85 L.Ed. 982; Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 546, 63 S.Ct. 727, 87 L.Ed. 959.

[5] Coder v. Arts, 8 Cir., 152 F. 943, 949, 950, 15 L.R.A.,N.S., 372, affirmed

213 U.S. 223, 245, 29 S.Ct. 436, 53 L. Ed. 772, 16 Ann.Cas. 1008.

[6] 7 Viner's Abridgement, 110.

[7] § 207(b) (5), Title 11 U.S.C.A.

[8] R. F. C. v. Denver & R. G. W. R. Co., 328 U.S. 495, 517, 66 S.Ct. 1282, 90 L. Ed. 1400.

[9] § 216(7), § 616(7), Title 11 U.S.C.A.

[10] 329 U.S. 156, 164, 67 S.Ct. 237.

to the Publicly Held Bonds interest in cash or in some equivalent to the date of the payment of the principal, had the Plan or the Agreement so provided.

■ Perhaps, since the question does not seem to have been raised when the Amended Plan was confirmed and the Agreement was approved, it would be now too late to upset them, if, as matter of interpretation they plainly intended this unlawful result, although that is not too clear in the case of the Agreement. Nevertheless, in the proper interpretation of these instruments, this consideration should weigh heavily in accordance with the well established canon that, when there is a choice, a court will prefer that construction which is lawful.[11]

Before resorting to the literal meaning of the words, it will be well also to consider whether there could have been a purpose in limiting the personal obligations of the New Company, and at the same time allowing full interest to the Publicly Held Bonds as lienors upon the collateral. We think that there may have been such a purpose. One of the chief aims of the reorganization, particularly in creating the New Company, was to get time to nurse along the collateral which it was hoped might recover part, perhaps much, of its original value. It was essential to this that none of the bondholders should be able to declare a default meanwhile, and that they must be content with whatever income might be realized. This the limitation of the New Company's liability secured. It may be retorted that, although this might have accounted for the suspension of the right to interest until the due date of the bonds, it does not explain why all deficiencies in interest then existing, should be cancelled, as § 8 of Article II of the Agreement declared. But there was a possible reason for that as well. The due date of each series was 1945, but in each a majority of the Publicly Held Bonds, if they wished, might extend the maturity to 1950; and it was possible that some of the series might do so, and some might not. If the New Company were to be liable for any deficiency in interest upon the Publicly Held Bonds in a series which became due in 1945, the bondholders in that series would be able to take judgment and execution against it, and that would, or at least it might, put an end to any further efforts to conserve the collateral of those series which were to last five years longer. Moreover, if we assume that, not only as against the New Company, but as against the collateral of each series, the bonds were to become income bonds, a very unequal distribution becomes possible. It would by no means follow that, because the income from the collateral in one series had not been enough to pay the interest in full, the collateral itself would not show a surplus; indeed that is exactly what has happened in the case of the Fifth and Ninth Series. Yet, if the New Company's immunity from liability for all deficiencies in interest, applies as well to claims against the collateral some of the res is released from the trust and turned over to the New Company. Quite aside from any question of its legality, this is mere spoliation of the beneficiaries of the trust, the Publicly Held Bonds; and we should not ascribe such an intent to the Plan unless the words allow us no escape.

■ After these preliminary considerations we must consider the words themselves for they are always the most important evidence of the parties' intention. The limitation of the New Company's obligation as to interest was indeed unconditional: the bonds were "to bear interest * * * only to the extent that the annual collections of Net Income * * * received from the Collateral * * * will suffice." However, that did not touch the priority of the bondholders as lienors; and, as we have seen, § 11 dealt with that by declaring that the Guarantor's Bonds were not to "be entitled to receive any distributions on account of principal," until the Publicly Held Bonds had been "fully paid." That phrase was at best ambiguous; and we can see no a priori reason for

---

[11] Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940; Great Northern Ry. Co. v. Delmar Co., 283 U.S. 686, 691, 51 S.Ct. 579, 75 L.Ed. 1349; In re John B. Rose Co., 2 Cir., 275 F. 409, 415; Behre v. Anchor Ins. Co., 2 Cir., 15 F.2d 380, 383.

incorporating into it by reference the limitation of liability for interest which had been granted to the New Company. Indeed, "fully paid" would normally include payment of all interest. So much then for the words of the Plan itself. At the end of § 8 of Article II of the Agreement the words were that the Guarantor's Bonds were not to "be entitled to share in the Collateral" until all the Publicly Held Bonds had been "paid or provided for in full according to their tenor." That too was at best equivocal; one is reminded of the ancient phrase, "secundum tenorem," which was usually employed to mean that the letter of the instrument itself should be followed. It is only when we come to § 10 of Article II that any difficulties arise; and it must be owned that the language there looks the other way. That section declared that upon none of the Guarantor's Bonds shall "any payments of principal or interest be payable" until the Publicly Held Bonds shall "have been fully paid, purchased or retired by the Corporation": i. e., the New Company. Read literally, it is hard to resist the construction that, after the New Company had discharged its individual promises, the Guarantor's Bonds were to begin to take. Must we so read the language?

The order of July 21, 1937, was of very different import; it allowed nothing to the Guarantor's Bonds until the Publicly Held Bonds had been "paid or provided for in full both as to principal and interest heretofore accrued or hereafter accruing." That language clearly meant interest in full, for the original plan had already limited the liability of the Debtor to income and it would be absurd to read such explicit language as intended merely to repeat the limitation; the contrast in locution cannot be disregarded. Conceivably an argument could have been made that by the time the Amended Plan was drafted the purpose had changed, even though § 11 remained as it was; but this the chronology forbids. The Guarantor appealed from the order, and it was not until January 8, 1938—which was after the Amended Plan had been drafted in its final form—that the appeal was settled; and the settlement explicitly accepted the terms of the order, so far as it defined priority. Even though we were to suppose that the language of § 11 standing alone would have left the matter open, this sequence of events shows that they must have been used eodem intuitu as in the order: that is, that the Plan exactly incorporated the order pro tanto. Up to that time anyway, the lien of the Publicly Held Bonds to the collateral was unabated.

As we have conceded, there is ground for saying that § 10 of Article II of the Agreement, read by itself, changed the Plan in this regard; but we think that the following is an inescapable answer to that position. After the Agreement had been drafted, it was approved without giving the Publicly Held Bonds any opportunity to withdraw from the reorganization. In so proceeding the judge relied upon the following language of subdivision f of § 77B: "Before or after a plan is confirmed, changes and modifications * * * may be made with the approval of the judge after hearing upon notice * * * subject to the right of any creditor or stockholder who shall previously have accepted the plan to withdraw his acceptance * * * if, in the opinion of the judge, the change or modification will be materially adverse to the interest of such creditor or stockholder * * *" He approved the Agreement because he held that the changes from the Amended Plan were not "materially adverse to the interest" of the Publicly Held Bonds; and so they were not, if the priority of those bonds as beneficiaries of the trust still included the right to recover full interest. On the other hand, if § 10 took away that right, they were not only materially prejudiced, but very gravely prejudiced, and the order of approval was illegal, for the judge's discretion was not controlling.[12] Indeed, if the Agreement did make that change, we should be disposed to hold that the order approving it was open to collateral attack, unlike the order confirming the Amended Plan. We say this because the right of a creditor to withdraw when the change is "materially adverse," seems to have been

---

[12] Downtown Investment Ass'n v. Boston Metropolitan Buildings, 1 Cir., 81 F.2d 314, 320.

made a condition upon the court's power to approve the change at all. That is very different from countenancing and enforcing a plan which contains illegal stipulations. Be that as it may, here the judge held positively that no part of the Agreement was "materially adverse" to any rights which the Amended Plan had given. That interpretation may have been right, or it may have been wrong, qua interpretation; it makes no difference, for it was a deliberate ruling that any changes were not to be deemed "materially adverse" to rights secured by the Amended Plan; and that reading is authoritative and controlling. Section 10 of Article II of the Agreement must therefore accord with § 11 of the Amended Plan; and § 11 of the Amended Plan incorporated the order of July 21, 1937.

Thus it appears that all relevant considerations conspire to demand that interpretation which the Publicly Held Bonds assert: i. e., the antecedent probabilities; the protection required for senior lienors; and the construction authoritatively placed upon the language used by the judge who authorized it. It is true that the special master in his findings of fact construed the Agreement otherwise; moreover, the findings in which he states this construction all begin with the words: "It was the intent of the parties and the fair intent and meaning of the Supplemental Trust Agreement." But such findings have not the presumptive validity which Rule 53(e) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, gives to a master's findings of fact. It is not necessary to analyze the mental process by which a court imposes legal consequences upon verbal utterances; possibly, it is proper to call the result a "finding of fact." It is enough here, that, whatever the right description, such a finding is assailable as an ordinary finding of fact is not; for appellate courts have untrammelled power to interpret written documents.[13]

As we said at the outset, the conclusion we have reached disposes of all the issues raised upon the appeal. The master found that, as of August 1, 1945, the deficiency of interest due upon the Publicly Held Bonds of the Fifth Series was $411,783.18, and that the principal due was $1,077,450, making a total of $1,489,233.18. He also found that the value of the collateral—including the amount restored by the trustee—was $1,506,513.65, so that only a small surplus of about $17,000 was left to pay the principal of the Guarantor's Bonds: $67,200. Even though the income for the two years which have followed has been enough to pay the interest in full, there will be no surplus for anyone but the Guarantor. The figures for the Ninth Series show an even greater deficiency, for there is no possibility of any surplus whatever, not even for the Guarantor.

The order will be reversed, and the cause will be remanded for further proceedings not inconsistent with the foregoing.

---

[13] Road Improvement Dist. v. Roach, 8 Cir., 18 F.2d 755, 759; Sun Indemnity Co. v. American University, 58 App.D.C. 184, 26 F.2d 556, 557.